UNITED STATES, Appellee

v.

LEHMAN C. BURNS, Basic Airman, U. S. Air Force,
Appellant

5 USCMA 707, 19 CMR 3

No. 847

Decided April 29, 1955

COL A. W. Tolen, USAF, and CAPT Frank Fedele, USAF, for Appellant.
LT COL Emanuel Lewis, USAF, and MAJ Stephen E. Ware, USAF, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

At a rehearing the accused was convicted of assault with intent to inflict grievous bodily harm and robbery. A board of review affirmed the findings on the robbery charge, but reduced the assault charge to assault with a dangerous weapon. It also reduced the period of confinement from six to five years. We granted further review to determine whether the accused was prejudiced as to the robbery charge by the law officer's instructions on insanity.

It is undisputed that the accused committed the offenses for which he was convicted. At the trial, however, a sharp conflict developed as to the circumstances of the crimes. For our purposes, we need only relate some of the evidence relied upon by the accused.

After an evening in town, the accused returned to the base in the company of a friend. On arrival, they went to the friend's barracks. The accused testified that he was then solicited for a homosexual act. He summarily rejected the advance, and immediately proceeded to his own barracks. En route, he found an iron furnace shaker handle. He picked it up. Continuing to his quarters, he passed the orderly room and noticed the Charge of Quarters asleep on a cot. Allegedly, the screen door at the entrance was open. The accused entered, walked over to the cot, and savagely beat the Charge of Quarters with the furnace handle. When the victim was smashed into unconsciousness, the accused stopped. He turned on a light and saw what he had done. He then looked around and noticed the Charge of Quarters' wallet on one of the desks. He took it and left the room. Outside he threw away the iron handle. Then seeing an Air Policeman he ran to his own barracks and hid under it. Later, he proceeded to his

sleeping bay, hid his bloody clothes behind a ventilator, and went to bed. Shortly afterward he was apprehended.

Psychiatric testimony indicates that the accused is a latent schizophrenic. According to the defense doctors, however, a person in that mental state can entertain the specific intent required for the offenses charged "just as any other of us might be able to do." All the doctors agreed that the accused was able to distinguish right from wrong. Disagreement arose over the accused's ability to adhere to the right.

The prosecution psychiatrist, Captain R. Zaitlin, Chief of Psychiatry, U. S. Air Force, Maxwell Air Force Base, Alabama, testified that the accused was capable of adhering to the right. Two defense psychiatrists, Dr. F. L. Dunn, former Chief of Psychiatry at Maxwell Field Air Force Base, and Dr. L. C. Scheinberg, former Chief. of Neuropsychiatry at Barksdale Air Force Base, Louisiana, were of the opinion that, if the accused had not forced the orderly room door, he was "probably" suffering from an acute psychotic episode during the assault on the Charge of Quarters. This episode was precipitated by the traumatic experience of the homosexual solicitation. The defense doctors also agreed that during the psychotic state the accused acted from irresistible impulse. However, both doctors further agreed that the episode ended with the assault, and did not encompass the theft of the wallet. The following excerpts from the record summarize their testimony in this connection:

### Dr. Dunn's Testimony

"Q. Then you do not contend that he had an irresistible impulse to steal or to rob?

A. I do not feel so.

.  .  .  .  .  .

"Q. All right, doctor. Now, let me just go over once again: Your testimony, in the strongest light available to the defense, is that the accused, probably, was in a psychotic state at the time of the alleged offenses on the morning of 1 September 1951. Is that correct?

A. That is correct, if you can be more specific with the alleged offenses —just from the standpoint of the actual beating of the individual.

"Q. Yes, not with the taking of the wallet.

A. All right. I do not feel that he was psychotic at that time."

### Dr. Scheinberg's Testimony

"Q. Would you try to answer yes or not [sic] if you can. In your opinion did the accused have any irresistible impulse to commit larceny or robbery on the morning of 1 September 1951?

A. I don't feel that he had an irresistible impulse to commit larceny or robbery. It's also—it is possible —now I offer this as conjecture for your own consideration—that the wallet was taken to cover up for the homosexual act because I think that in the minds of most people one would rather be accused of being a petty thief than being accused of homosexuality. It is possible that the wallet was taken as a second thought to cover up for his homosexual attack on this man."

The accused testified in his own behalf. In referring to his conduct after the assault, he said:

"Q. You felt that you had to get out of Turner Air Force Base, out of Albany. Is that correct? Is that what you would have done?

A. Yes, sir.

"Q. And you took this $23.00— the money out of Sergeant Haney's wallet to aid you in your escape. Is that right?

A. Yes, sir.

"Q. You knew what you had done was wrong, didn't you?

A. Yes, sir.

.  .  .  .  .  .

"Q. What did you do?

A. I was excited and frightened

710

and I wanted to escape apprehension, and I left, taking his wallet.

"Q. Would you tell the court what your reason was for taking the wallet.

A. To escape, sir. To get as far away as I possibly could.

"Q. You thought you might need money for that purpose, is that right?

A. Yes, sir. The more money I had the further away I could get."

The law officer gave general instructions on the effect of legal insanity. He did not instruct the court that it could consider the evidence of the accused's mental condition for the purpose of determining whether the accused was capable of entertaining the specific intent required for robbery. Defense counsel did not request further instructions, and he made no objection to the instructions as given. The accused now contends that he was prejudiced by the law officer's failure to give the more particularized instruction.

Mental impairment has two consequences as far as responsibility for crime is concerned. First, if it is of a sufficient degree to prevent the accused from knowing right from wrong or from adhering to the right, it will exonerate him completely from criminal responsibility for his conduct. Second, if it is of a lesser degree, it will not absolve him from all responsibility, but it may negative the existence of a particular element of the crime so as to reduce it to a lesser offense.

A general instruction on mental deficiency as a basis for complete exoneration does not suffice to inform the court-martial members of the "important principle that mental impairment, less than legal insanity, might be considered" in determining the degree of the offense committed by the accused. United States v. Kunak, 5 USCMA 346, 362, 17 CMR 346. When appropriate, therefore, the law officer must instruct not only on the general effect of legal insanity but on the more narrow effect that the accused's mental responsibility might have on the specific intent required for the offense charged. The general rule was stated in United States v. Higgins, 4 USCMA 143, 148, 15 CMR 143, as follows:

". . . It would seem to follow that if an accused person produces evidence of an underlying mental state, which might have served to affect his intent at the time of the acts alleged, then the law officer should advise the court that its members may properly consider the evidence of mental condition in determining the accused's capacity to entertain premeditation, intent, or knowledge— when any of these is relevant to an offense charged."

Ordinarily, mental deficiency, less than legal insanity, will reduce the crime to a lesser offense requiring no specific state of mind. See United States v. Kunak, supra. Robbery, however, is a compound of two separate offenses. United States v. Calhoun, 5 USCMA 428, 18 CMR 52. One is assault. This requires no specific intent and, consequently, mental impairment short of legal insanity will not absolve the accused of criminal responsibility. The second separate offense included in a robbery charge is larceny. This requires a specific intent. Therefore, the accused's mental condition may affect his capacity to entertain the required intent. Moreover, in a prosecution for larceny, a proper instruction on the effect of partial mental deficiency has even greater practical consequences. Military law does not punish as an offense an unlawful taking which is not accompanied by a specific intent. United States v. Norris, 2 USCMA 236, 8 CMR 36. Consequently, if the court were to find that the accused's mental condition prevented his entertaining a specific intent, its finding would exonerate the accused of all criminal responsibility, rather than simply reducing the crime charged to a lesser offense. Thus, if the effect of partial mental impairment was reasonably raised as an issue, it was important to the accused that the court be correctly instructed.

An analysis of the evidence of the accused's mental condition indicates a sharply-defined division into two parts. One part relates to the accused's assault on the Charge of Quarters. The second is concerned with the larceny. According to the defense doctors, the first was the result of a psychotic episode. But, in connection with the second, they both agreed that the accused had recovered from that state immediately after the assault, and was then fully able to understand right from wrong and to adhere to the right. Moreover, they each agreed that in the absence of an actual psychotic episode, the accused was completely capable of entertaining the specific intent to steal. It is readily apparent, therefore, that the evidence of accused's mental impairment reasonably raised an issue only with regard to the assault part of the robbery charge. No question whatever was raised regarding mental deficiency affecting the specific intent required for larceny. In fact, the inescapable conclusion which must be drawn from the evidence is that the accused was fully able to, and did actually, entertain an intent permanently to deprive his victim of his wallet. The accused's testimony amounts to a judicial confession of larceny, and clearly shows his mental responsibility for that act.

On the basis of the evidence, an instruction as to the effect of the accused's mental condition was required only as to the assault. None was required as to the larceny. The law officer did not differentiate between the two offenses, but his failure to do so did not harm the accused.

If the law officer had properly limited his instructions, the court could have considered the evidence of insanity in connection with only one of the two ingredients constituting the crime of robbery. Instead it was permitted to apply the evidence to both offenses. Hence, if the court had determined that the accused could not adhere to the right when he committed the assault, it was authorized, under the instructions, to return a finding of not guilty of the entire charge. This was *more* than the accused was entitled to on the evidence.

He had judicially admitted his guilt of larceny; and the evidence shows that when he committed that offense he had no mental deficiency which could affect his capacity to entertain the required intent. In the light of this evidence, it is doubtful that the court would have been willing to completely acquit the accused. See United States v. Calhoun, supra. The court, however, was not restricted to a choice of complete acquittal or complete guilt. It had been instructed that larceny was a lesser included offense and that a finding of guilty could be returned thereon. This instruction eliminates any possibility that the accused's judicial confession of larceny influenced the court to give less than full consideration to his defense of insanity with regard to the assault. The accused, therefore, was not prejudiced by the law officer's instructions.

The decision of the board of review is affirmed.

Judge BROSMAN concurs.

LATIMER, Judge (concurring):

I concur.

Because I prefer to base my decision on a legal concept which is not mentioned in the majority opinion, I file this concurring opinion.

In order to decide whether instructions concerning the accused's mental capacity to entertain a specific intent were required, it is necessary to determine the manner in which his irrestible impulse affected his responsibility for the crime of robbery. For the purposes of ascertaining whether the issue of a mental deficiency not amounting to legal insanity was raised reasonably, we must accept the testimony that the assault committed by the accused occurred while he was in a psychotic state. Immediately thereafter, he turned on the light in the orderly room and recovered his senses. While testifying in his own behalf, he stated when the room was illuminated he saw that the victim was bleeding and noticed blood on his own clothes. He then appreciated for the first time that he had committed an aggravated assault. Realizing his dilemma he took

the victim's wallet, and fled. According to the experts on mental disorders, the sequence of events following the assault transpired while accused was mentally responsible. Those facts present us with the narrow question of whether in order to establish the crime of robbery the prosecution must show that the intent to steal was contemporaneous with or antecedent to the force and violence exerted upon the injured party. I conclude that under certain peculiar factual situations, it need not, and this case happens to be one where the offense is established even though the assault preceded by a few moments the formation of the specific intent to steal.

Robbery is defined as a taking, with intent to steal, anything of value from the person of another, against his will, by means of force or violence or fear of immediate or future injury. Article 122, Uniform Code of Military Justice, 50 USC § 716. It has been held by respectable authority that an individual who comes upon an unconscious person and thereafter takes his purse does not commit robbery. From a medical standpoint and for the purposes of this case, it may be assumed that an insane person is a stranger to himself during his psychotic episode. But the rule is otherwise where an accused, by force and violence, causes a state of unconsciousness in another and, before the effects of the force and violence have been dissipated, decides to steal from the person of his victim. The premise based on that hypothetical state of facts is that the taking is by means of force and violence in that the accused seizes upon the results of his own misconduct to abscond with the property. Thus, the intent is formed while the effects of the force are still operative and the taking is, for all practical purposes, made possible by the violence employed.

To support my position I will refer to five reported cases which have considered this problem. In People v. Jordan, 303 Ill 316, 135 NE 729, 730 (1922), it was the contention of the accused that he assaulted his victim and thereafter, as an afterthought, took the victim's money. The Supreme Court of Illinois held:

". . . The fact that the defendant [in the fight] had been reduced to a state of physical nonresistance before his money was taken does not relieve the crime of the quality constituting robbery. If, as the result of a quarrel, a fight occurs, in which one of the parties is overcome, and the other then, without having formed the intention before the fight began, takes the money of the vanquished one, the offense committed is robbery."

In Alaniz v. State, 147 Tex Cr Rep 1, 177 SW2d 965, 967 (1944), it was held:

"If appellant and his companions, without a previous intention to take Laweller's money, assaulted him because of some insulting remark regarding Mexican soldiers and reduced him to a state of unconsciousness and then took his money with the fraudulent intent to appropriate it to their own use the offense is robbery."

In Turner v. State, 150 Tex Cr Rep 90, 198 SW2d 890, 892 (1946), it was contended by the defendant that if the facts established only a fight in which the victim was worsted and his money thereafter taken, the offense of robbery would not be established. His further contention was that, at most, he was guilty only of theft from the person, on the theory that there had not been any assault with intent to rob. Once again, the Texas Court rejected the defendant's contention and held in accordance with the *Jordan* case, supra, and also their own prior holding in the *Alaniz* case, supra.

In Wynn v. Commonwealth, 135 Ky 447, 122 SW 516, 518 (1909), the accused, a deputy marshal, arrested two persons because they were drunk and disorderly. He thereafter searched them, took their money, and kept it. The Court held:

". . . If Wilson and Kenny when found by appellant were drunk or disorderly, he had the right as deputy marshal of Nortonville to arrest them without a warrant, and, following such arrest, to search their persons for the purpose of ascertaining

whether they were in possession of weapons or other means of resisting his authority as an officer, or of effecting their escape if imprisoned, but, if in making such search appellant obtained from their persons money, it was his duty to return it upon discharging them from arrest. If, however, after making the arrest, he took advantage of the duress under which such arrest placed them, and by force or by putting them in fear took from them money in their possession, feloniously intending at the time to convert it to his own use, his act in doing so was robbery."

It is noted that in the last cited case, the search was not made contemporaneous with the arrest. Instead, the deputy sheriff marched his two prisoners about seventy-five yards from the place of arrest to an isolated area where he searched them. That case seems to suggest that if the search had been made without a concurring intent to steal and that the felonious intent was formulated at some subsequent time, the offense committed would be no more than larceny.

The case of Howard v. Commonwealth, 233 SW2d 282, 284 (Ky 1950), offers not only a holding in point, but a sketchy development of the principle involved. The accused, a trespasser, entered the home of the victim, drew a pistol and gestured with it, tore the victim's clothing, and manifested a purpose to rape her. When she screamed, the accused fled, seizing her purse from the couch as he left. The Court reasoned as follows:

". . . Though his entrance into the house and his primary or initial purpose may have been to commit a criminal assault, or even larceny rather than robbery, the certain fact is that the lady was under great terror at the time the defendant picked up and carried her purse away with the intention of stealing it. The whole occurrence was one transaction. It is not important whether Howard formed the purpose of stealing some item of property before he entered the room or whether it was an afterthought arising when he saw the purse on the couch. The fear once created continued to operate on the mind of the victim. If he availed himself of the state of terror in which he had placed Mrs. Davis, that was sufficient."

All of the cited cases stand for the proposition that where an accused defends upon the grounds that his intent to steal was formed after he had rendered the victim unconscious, or subsequent to the time of the felonious assault, he cannot prevail. Here, the accused admitted that he comprehended fully, after his sanity was restored, that he had assaulted the victim. He then formulated an intent to deprive the injured man of his property and did so successfully, in full reliance upon the state of helplessness which he had ruthlessly brought about. The two severable acts, namely, the assault and the taking, were so closely tied together in time and effect that the force employed in disabling the victim was the means by which the taking was made possible. Conceding the lack of capacity to formulate a specific intent, when the assault was committed, the restoration of his normal senses permitted the accused to realize that the taking was wrongful and could be accomplished without difficulty because of the physical condition of the victim. The irresistible impulse which gripped the accused during the assault had disappeared before the theft and he was mentally capable of resisting the impulse to steal. At that time he was able to carry out his plan by vitrue of his assault which was so closely connected with the taking that the two were in fact parts of a single transaction. In connection with this concept I need go no further than to state that when the two component parts of the crime are so closely related in time and effect, the essential elements of robbery have been proven and it makes no difference whether the intent to deprive permanently is contemporaneous with the assault or follows it, so long as the taking is a direct product of the force and violence.

I, therefore, conclude that the offense

714

of robbery was committed after the psychotic episode was ended, and an instruction on partial impairment of mental faculties was not required.