**UNITED STATES, Appellee,**

v.

**Gregory C. THOMAS, Private E–1 U. S. Army, Appellant.**

No. 39,169.

CM 438932.

U. S. Court of Military Appeals.

Aug. 17, 1981.

…

Appellant: *Captain Dennis E. Brower* (argued); *Colonel Edward S. Adamkewicz, Jr., Major Grifton E. Carden* (on brief).

Appellee: *Captain Richard P. Laverdure* (argued); *Colonel R. R. Boller, Major Ted B. Borek, Captain John T. Meixell* (on brief).

## OPINION OF THE COURT

EVERETT, Chief Judge:

On October 17–18, 1979, at Fort Leonard Wood, Missouri, appellant was tried by a general court-martial composed of officer members. Pursuant to his pleas, he was found guilty of assault and battery upon Private Thomas A. Cullen by striking him in the face with his fist, in violation of Article 128 of the Uniform Code of Military

Justice, 10 U.S.C. § 928. However, contrary to his pleas, Thomas was found guilty of robbing Private Victor J. Winters, in violation of Article 122 of the Code, 10 U.S.C. § 922.[1] He was sentenced to a dishonorable discharge, confinement at hard labor for 4 years, and forfeiture of all pay and allowances.

The convening authority approved only so much of the sentence as provided for a dishonorable discharge, confinement at hard labor for 18 months, and total forfeitures. On April 24, 1980, the United States Army Court of Military Review summarily affirmed the findings and sentence as approved. We granted review of these issues (9 M.J. 247):

### I

WHETHER PROSECUTION EXHIBIT 4, NONJUDICIAL PUNISHMENT UNDER ARTICLE 15, UCMJ, WAS IMPROPERLY ADMITTED INTO EVIDENCE.

### II

WAS THE INSTRUCTION ON REASONABLE DOUBT ADEQUATE AND SUFFICIENT?

### III

WHETHER THE INSTRUCTIONS [sic] ON UNCHARGED MISCONDUCT WAS PREJUDICIAL TO THE ACCUSED.

 Only the last issue requires much discussion. As appellate government counsel correctly observed in his Motion For Leave To File Supplemental Citations of Authority,[2] our subsequent decision in *United States v. Mack*, 9 M.J. 300 (C.M.A.1980), disposes of the first issue, since the record of nonjudicial punishment in question was properly completed. Also *United States v. Goodwin*, 9 M.J. 216 (C.M.A.1980), applies here, for the convening authority substantially reduced the appellant's confinement.

1. Appellant was found not guilty of communicating a threat to kill Private Winters.

2. This motion was granted by the Court without any opposing pleading being filed by the appellate defense counsel.

As further noted in the government's motion, *United States v. Salley*, 9 M.J. 189 (C.M.A.1980), disposes of the second granted issue, as the defense counsel neither objected to any of the instructions on reasonable doubt nor proposed any clarifying instructions.

The final claim of the appellant concerns alleged acts of uncharged misconduct and prejudicial instructions given by the trial judge to the court members regarding the use of that evidence. For a full understanding of this claim, it is necessary that we detail the pertinent facts.

I

On the night of June 29, 1979, Privates Cullen and Winters were drinking beer in a park at Fort Leonard Wood in celebration of Cullen's scheduled departure from the post on the next day. Appellant and Private Issac—who according to some of the testimony were using the respective alias of Taylor and Williams—came by and were offered a beer, which they initially refused. Later they returned and the four soldiers drank beer until they left the park together at the direction of a military policeman who told them it was closed. They proceeded to an area near a barracks where they talked and drank more beer. As they were carousing, appellant produced a knife and asked Winters if he wanted to buy it, but Winters declined. When Winters in turn offered to sell Thomas a watch for $2.00, he refused the offer, but asked Cullen about selling appellant his watch. When Cullen said that he did not wish to sell his watch, appellant suddenly struck Cullen and knocked him to the ground. Thereupon Winters struck at the appellant—although the testimony is in conflict as to whether Winters swung at appellant with a belt or only with his fist; whether appellant was hit; and whether he fell to the ground. At this point, Thomas had in his hand his knife, which someone had opened earlier.

Winters testified that at this time he had yelled to Cullen "to get up and run"; but Thomas, in turn, had "tackled" Cullen. Winters attempted to "get him off of Cullen, and when I got there he had gotten up off Cullen and came back at me." When Winters tried to flee, he tripped and fell. This witness then testified that, when he got up, "Issac caught me, and I was thrown on the ground and then the both of them were on me and I had my face to the ground, I was on my stomach." Winters then felt appellant's knife poking him in the back; and while he lay prostrate, his wallet was removed from his pocket by appellant. At some point thereafter, Issac had possession of the wallet, which he threw back to Winters. However, it no longer contained the $20.00 which was in the wallet before the affray.

Cullen also testified how the robbery of Winters occurred. He stated that, when appellant and Issac had Winters on the ground, he ran back to them to help his friend; but appellant "kept sticking [his] knife to [Winters'] back and said, 'If you come near him, I'll cut him.'" While Winters was in this plight, appellant "grabbed the wallet out of [his] back pocket and got up and took off running." Cullen further stated that, when Winters and he first had attempted to flee, the appellant had tackled him and had also taken his wallet from him. As he testified:

Well, I remember getting up, and Victor told me to run, so I started running and I got about I'd say 30 yards when the guy Taylor [3] tackled me. He stuck the knife to my back and took the wallet out of my pocket and then I remember him getting up, he was running back towards where Victor was, so I got up and I told Victor to run, so somehow Victor maneuvered around him and we both started running for the street. I was about 10 feet in front of them, so when I then turned around again, I saw that the two of them had—had him on the ground.

---

**3.** It will be recalled that appellant was using the alias of "Taylor," while Issac had identified himself to Winters and Cullen as "Williams."

When Private Issac was called as a government witness, he testified that, after Winters ran,

> he tripped over his feet so me and Thomas, we caught up with him and then he was standing—him and Thomas was standing apart so I stepped in between him and Thomas and then Thomas came toward us and we all three fell on the ground. We was holding a knife that was in Thomas' hand. Somehow we got the knife to drop on the ground and the next thing you know I seen Thomas reach around his back and then he came up with his wallet, and he got up off the dude and then he stood up and he went through his wallet.

Taking the stand as a witness in his own behalf, appellant confirmed the occurrence of the initial events described by other witnesses. According to him, after he had hit Cullen in the side of the face and knocked him down, he saw Private Winters swinging his belt at him. Thomas responded by telling Winters, "If you don't put the belt down, I'll cut you." However, Winters swung again, hit the appellant, and knocked him down. When appellant got up, he "was mad and I chased Private Cullen," who, at the urging of Winters, had begun to run away. Appellant "made him fall" and was "down on the ground with Cullen" for a couple of seconds; but appellant specifically denied that during the brief period he and Cullen were on the ground, he had taken Cullen's wallet. When the two of them were down, Private Winters was coming back at Thomas with a belt.

According to the appellant's testimony, he then pursued Winters, who finally "took out his wallet and told me to take his money and leave him alone." Appellant picked up the wallet, which Winters had thrown to him, but he threw it back. Thomas emphatically denied that at any time he had reached into Winters' pocket and pulled out a wallet. He further dismissed as falsehoods the testimony of other witnesses to the contrary. However, he conceded that, after "Private Issac had grabbed [Private Winters] from behind . . . somehow us three had got to the ground."

## II

When Cullen testified that at knife point appellant had also taken a wallet from him, the defense did not object. However, early in the trial at an Article 39(a), 10 U.S.C. § 839(a) session, the defense counsel made a motion *in limine* to restrict the Government from adducing any testimony about the taking of Cullen's wallet and certain other acts. The defense claimed

> that any evidence of this sort would be so extremely prejudicial and so extremely inflammatory as to outweigh any possible probative value that—that could be derived from it. We would urge that the—the basic nature of this testimony would be simply to convince the panel that Private Thomas is predisposed toward criminal activity and that therefore he is likely to have committed the other crimes, without falling into one of the specific exceptions listed in [paragraph] 138(g).

On the other hand, trial counsel argued that the taking of Cullen's wallet was an integral part of the court-martial charges and was necessary to a complete understanding of the events culminating in the robbery of Winters. Furthermore, he asserted that the taking of Cullen's wallet was relevant to show the intent of appellant to rob Winters.

Initially, the military judge ruled that the motion *in limine* was not appropriate under the circumstances and that he would withhold any ruling on this matter until such time as Cullen's testimony was actually being offered by the prosecution. When Cullen appeared as a witness, the defense did not renew its motion, and, as indicated by Cullen's quoted testimony, he proceeded to testify that his wallet had been taken by the appellant.

Prior to instructions on findings, trial counsel requested that the judge advise the court members

> that they may consider the evidence bearing on the accused's taking Mr. Cullen's wallet and going through it; that if they believe such testimony that they may then consider it with respect to the intent

or motive that the accused had on that evening to enrich himself.

However, the defense counsel objected to the proposed instruction and stated that, if any instruction had to be given, the court members should be instructed that the testimony concerning the taking of Cullen's wallet was only admitted "to fill . . . a gap . . . in the course of events." Counsel further urged that the court members be admonished "not [to] draw any inference as to the . . . guilt of the" appellant based on that testimony.

The instructions eventually given by the military judge to the court members were as follows:

In this case, there was testimony that the accused—there was admitted testimony that the accused allegedly took a wallet from the person of Private Cullen. This testimony was—was admitted for a limited purpose, and it may be considered only for the limited purpose of its tendency, if any, to prove a guilty intent; that is, that the accused intended to commit the offense of robbery at that time and that place on the evening in question. I wish to emphasize that such evidence may be considered for no other purpose whatsoever. You may not infer from such evidence that the accused has an evil disposition or criminal propensity and that he therefore committed the offense—later offenses alleged.

Before us, appellate defense counsel claim that this instruction was incorrect and highly prejudicial to the appellant, because the instruction permitted the court members to consider the taking of Cullen's wallet as evidence of the appellant's intent to rob Winters. Also, in permitting such consideration in relation to appellant's intent, the judge confused an intent to commit the crime of robbery with the specific intent permanently to deprive the owner of his property, which is merely one element of the robbery offense. Furthermore—accordingly to the appellant—"the court could *not* consider the testimony to show any intent, plan, or design to rob Winters, nor for any other purpose." [4]

Another contention of the appellant is that the judge's instructions were inherently inconsistent, since in the first part of his instructions he told the court members that they could consider the taking of Cullen's wallet as evidence of appellant's intent to commit the robbery of Winters, and then in the last part of the instructions, the judge told the court members that they could "not infer from such evidence" that the appellant had robbed Winters. The appellant has urged that any doubt as to the clarity of the instructions must be resolved in his favor.

### III

At the outset, we note that the evidence concerning the taking of Cullen's wallet was clearly admissible. In denying the motion *in limine*, the military judge had placed defense counsel on notice to renew his objection to this evidence when it was offered; so the failure of the defense to object to Cullen's testimony that his own wallet had been taken—or to move that this testimony be stricken—waived any objection to admissibility. Moreover, even if there had been an objection, this testimony would still have been admissible. In this connection, we point out that in several cases we have drawn a distinction for instructional purposes between uncharged misconduct which is inextricably related in time and place to the offenses charged and uncharged misconduct which lacks this nexus. In the latter situation, the judge has some obligation to give an instruction on "uncharged misconduct"—at least, in the absence of a defense request to the contrary, *see, e. g., United States v. Wray*, 9 M.J. 361 (C.M.A.1980); in the former, no such obligation exists. *United States v. Fowler*, 9 M.J. 149, 150 (C.M.A.1980); *United States v. James*, 5 M.J. 382, 383 (C.M.A. 1978); *United States v. Grunden*, 2 M.J. 116 (C.M.A.1977). A similar distinction can be made as to admissibility of evidence of uncharged misconduct.

In the case at hand, the testimony about the taking of Cullen's wallet involved an act

4. Final Brief on Behalf of the Accused, p. 6.

which occurred in the midst of the events which gave rise to the charge that appellant had robbed Winters. In traditional parlance, the taking could be viewed as apart of the *res gestae*. Or, observed from the standpoint of avoiding confusion of the court members, the admission of the evidence can be justified in terms of preventing a gap in the narrative of occurrences—a gap which might have induced unwarranted speculation by the members as to what had transpired but had not been revealed to them. Indeed, a rule limiting the admissibility of testimony like that of Cullen would provide an inducement to prefer more charges in order to avoid lack of continuity in the evidence received. At a time when multiple charges for a single transaction are already commonplace as a means for meeting the exigencies of proof, we are not anxious to provide an added inducement for overcharging.

Moreover, the evidence was admissible in terms of the rationale ultimately relied on by the judge in his instructions. In this connection, we consider the import of paragraph 138*g* of the Manual for Courts-Martial, United States, 1969 (Revised edition), which was in effect at the time of trial.[5] The purpose of paragraph 138*g* is to avoid the admission of evidence whose chief effect will be to demonstrate that an accused is a person of bad character and therefore is probably guilty of whatever offense is being prosecuted at the time. Thus, it states:

> However, if evidence of other offenses or acts of misconduct of the accused has substantial value as tending to prove something other than a fact to be inferred from the disposition of the accused or is offered in proper rebuttal of matters raised by the defense, the reason for excluding the evidence is not applicable.[6]

The 1969 Manual sets forth seven specific situations—each with examples—in which evidence of uncharged misconduct may be admitted. However, we would infer that the admissibility of evidence is not conditioned on its fitting within one of these seven niches, so long as it is not being used only for "raising an inference that the accused has a disposition to do acts of the kind charged or criminal acts in general." See para. 138*g*, Manual, *supra*, and Manual for Courts-Martial, United States, 1951.[7]

The Government has argued that the evidence as to the taking of Cullen's wallet fits within some of the seven situations specified by paragraph 138*g* for admission of uncharged misconduct. Of course, in the context of a drunken affray like that to which the present record attests, it does not appear that appellant had any "plan or design" to rob anyone. However, the prosecution was not required to prove a plan but only a specific intent permanently to deprive Winters of the $20.00 contained in his wallet. In view of the propinquity of time and place, we conclude that appellant's taking of Cullen's wallet from his pocket by violence immediately before he allegedly removed the wallet by force from Winters' pocket tends to prove the "intent" which is an element of the offense charged, see para. 138*g*—namely, the intent to steal from Winters. Appellant's seizure of the two wallets—neither of which he retained—tends to show that he really was interested in the contents of the wallets and that his purpose was to determine if money was in the wallets. In view of the circumstances under which he obtained possession of the wallets, a trier of fact could logically find that appellant proposed to retain for himself any money that he found in the wallets and that his retention of the money would not have been only temporary.

█ Appellant also complains that the evidence of a taking from Cullen should not

5. Paragraph 138*g* follows closely the corresponding provision of the Manual for Courts-Martial, United States, 1951, which, in turn, seems to be based on the common law. Mil.R. Evid. 404(b) makes no substantial change in paragraph 138*g* of the manual for Courts-Martial, United States, 1969 (Revised edition). *See* Analysis to Rule 404(a).

6. The language of the 1969 Manual is identical with that of its 1951 predecessor except for addition of the words "or is offered in proper rebuttal of matters raised by the defense."

7. For a helpful discussion of this issue, *see United States v. Haimson*, 5 U.S.C.M.A. 208, 226–27 n.4, 17 C.M.R. 208, 226–27 n.4 (1954).

have been admitted unless it clearly established that misconduct. Even if this were a correct premise, Cullen's testimony about the taking of his wallet was definite enough to be received. Moreover, with respect to uncharged misconduct which is part of the transaction giving rise to the charges being tried, there is no rigid limitation as to the quantum of proof of that misconduct which must exist in order to permit its admission in evidence. The only limitation on admission is a proper exercise of the judge's discretion to exclude the evidence if its probative value is outweighed by such dangers as unfairly prejudicing the accused or confusing the trier of fact. *Cf.* Mil.R.Evid. 403. In the case at hand, we perceive nothing which required the military judge to exclude the testimony by Cullen that appellant had knocked him down and removed his wallet.

## IV

■ What we have said as to admissibility presages our disposition of the claims of instructional error. The military judge informed the court members that they could consider the taking of Cullen's wallet as it bore on appellant's intent to rob Winters. It would have been more accurate to have instructed that the taking could be considered as to appellant's intent permanently to deprive Winters of his money, this intent being one element of the offense of robbery with which appellant was charged. However, in light of the explanation of the elements already provided to the court members concerning the elements of robbery, we do not perceive how appellant was prejudiced. The phrase "inten[t] to commit the offense of robbery," which was used in the challenged instruction, implies that an accused intended to assault someone in order to obtain property from the victim and retain it permanently. However, there is some precedent that a robbery has been

committed when an accused assaults a victim and then, having reduced him to helplessness, for the first time formulates 'he specific intent to deprive him permanently of his property. *See United States v. Burns,* 5 U.S.C.M.A. 707, 713–14, 19 C.M.R. 3, 9–10 (1955) (Latimer, J., concurring), and cases cited therein; *United States v. Hamlin,* 33 C.M.R. 707, 710 (A.F.B.R.1963), *pet. denied,* 13 U.S.C.M.A. 713, 33 C.M.R. 436 (1963). Thus, the military judge's reference to intent to rob favored appellant because it tended to suggest that the prosecution must prove an element that may not have been required for conviction—namely, that Thomas already intended to take Winters' wallet when he first assaulted him.[8] Moreover, if an instructional ambiguity existed which, in the defense view, somehow prejudiced appellant, an objection or request for instruction should have been forthcoming at the trial level and in the absence thereof no relief will be provided here. *Cf. United States v. Robinson,* 11 M.J. 218 (C.M.A. 1981); *United States v. Salley,* 9 M.J. 189 (C.M.A.1980).

■ Finally, we reject appellant's complaint that it was inconsistent with the other instructions for the military judge to inform the court members that they should not consider the taking of Cullen's wallet to show a general bad character on appellant's part. While the instruction was not necessary, *cf. United States v. Fowler, supra,* it was a perfectly correct statement of law and—at least absent a specific request from counsel that it not be given—we cannot perceive in the present case any risk of harm to appellant from the judge's having so instructed the members.

## V

Accordingly, the decision of the United States Army Court of Military Review is affirmed.

Judges COOK and FLETCHER concur.

---

8. In light of the evidence in the present case, this distinction is probably academic because, if Thomas took Winters' wallet, he did so while *still* actively in the process of applying force against his victim. However, in a robbery prosecution where a victim initially has been rendered helpless by an assault, the outcome might hinge on whether the Government is required to establish beyond reasonable doubt that from the start the accused intended to steal from the victim, instead of forming that intent when he recognized that his unconscious or otherwise helpless victim provided a target of opportunity.