# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**R.Q. WARD, J.R. MCFARLANE, K.M. MCDONALD**
**Appellate Military Judges**

**UNITED STATES OF AMERICA**

**v.**

**BRANDON J. BROWN**
**SERGEANT (E-5), U.S. MARINE CORPS**

**NMCCA 201300181**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged**: 24 April 2012.
**Military Judge**: LtCol C.A. Miracle, USMCR.
**Convening Authority**: Commanding General, 2d Marine Aircraft Wing, Cherry Point, NC.
**Staff Judge Advocate's Recommendation**: LtCol J.J. Murphy, USMC.
**For Appellant**: Philip D. Cave, Esq.; LT Jennifer L. Myers, JAGC, USN.
**For Appellee**: Maj Paul M. Ervasti, USMC.

**30 June 2014**

---------------------------------------------------
## OPINION OF THE COURT
---------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

WARD, Senior Judge:

A general court-martial consisting of officer and enlisted members convicted the appellant, contrary to his pleas, of making a false official statement, assault consummated by battery, communicating a threat, and two specifications of wrongfully possessing firearms after having been convicted of a misdemeanor crime of domestic violence, in violation of Articles 107, 128, and 134, Uniform Code of Military Justice, 10 U.S.C.

§§ 907, 928, and 934.  The members sentenced the appellant to confinement for 15 years, reduction to pay grade E-1, total forfeiture of pay and allowances for 12 months, and a dishonorable discharge.  The convening authority approved the sentence as adjudged.

On appeal, the appellant raises eight assignments of error (AOE).[1]  We address only two: admission of improper character evidence under MILITARY RULE OF EVIDENCE 404(b), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) (AOE II), and legal sufficiency of the false official statement conviction (AOE VI).  We find the remaining assignments of error either without merit (AOE I, III, IV, and V) or rendered moot (AOE VII and VIII) by our decision.[2]  Having carefully considered the record of trial, the assignments of error and the parties' pleadings, we find error that materially prejudiced both the findings and sentence, and take corrective action in our decretal paragraph.[3]

---

[1] I. That the military judge erred by denying the defense challenge for cause against Staff Sergeant [S];

II. That the military judge abused his discretion in ruling on a motion in limine and on other evidentiary objections, which allowed for a constellation of errors which substantially prejudiced appellant's right to a fair trial;

III. That the guilty finding for assault and battery is factually and legally insufficient;

IV. That the military judge abused his discretion by denying the appellant's motion to suppress wherein Sergeant Major [S] made statements which he knew or had reason to believe were false, or were made with reckless disregard for the truth;

V. That the guilty findings for wrongfully possessing firearms in violation of 18 U.S.C. § 922(g)(9) are neither factually nor legally sufficient;

VI. That the guilty finding for making a false official statement is neither factually nor legally sufficient;

VII. That the offenses for violation of 18 U.S.C. § 922(g)(9) are unreasonably multiplied both for findings and sentencing;

VIII. That the appellant's sentence to confinement for 15 years is inappropriately severe.

[2] As to AOE VII, the appellant's claim that his guilty findings under 18 U.S.C. § 922(g)(9) for possession of two loaded firearms in the trunk of his car are unreasonably multiplied, we note that the Government concedes on appeal that it is "well established that the simultaneous possession of several weapons constitutes only one offense" for purposes of 18 U.S.C. § 922(g)(9).  Appellee's Brief of 18 Feb 2014 at 39.

[3] Additionally, we note that the time between sentencing and the convening authority's action exceeded 120 days.  Balancing the four factors under

## Factual Background

        This case arose out of a series of domestic disturbances involving the appellant and his wife, EB.  In 2011, the appellant was convicted in District Court, Onslow County, North Carolina, for misdemeanor assault of EB, and received a sentence of 60 days confinement suspended for twelve months.  He later stipulated at his court-martial that this conviction was a "misdemeanor crime of domestic violence."[4]

        On 1 April 2012, EB called 911 and reported that her husband was threatening to kill her at their off-base apartment. On 28 April 2012, a neighbor called 911 and reported that he could hear "spousal abuse" coming from the appellant's apartment, that he could hear a female voice "screaming and crying," and that this was "not the first time [he's] heard them fighting."[5]

        On 29 April 2012, a civilian acquaintance of the appellant, Mr. G, reported to base military police an incident with the appellant occurring earlier that day.  That morning, he alleged, the appellant accosted him while pointing a pistol at him. However, Mr. G. later refused to cooperate with military police in any investigation.

        On 10 June 2012, EB again called 911 and told the operator that she wanted to "report a domestic violence" against her husband because he had "jumped on [her] and stuff."[6]  When police arrived, EB told them that she and her husband had been arguing when he "punched her in the face, threw her on the ground and started kicking her . . . ."[7]  The police officers took photos of a knot on EB's forehead and several bruises.  Once they explained that they would arrest her husband, however, EB's demeanor changed and she asked them not to arrest him or take any further action.  She then refused to sign any statement and instructed her friend who was present to do the same.  They both

---

*United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006), we find no post-trial due process violation occurred.

[4] Prosecution Exhibit 2.

[5] PE 7.

[6] PE 8.

[7] Record at 361.

declined to give any further details and refused to cooperate in any investigation.

On 12 June 2012, the appellant's commanding officer ordered him into pretrial confinement. After his Initial Review Officer (IRO) hearing the following day, the appellant was sitting in an office with his command legal officer and another member of his squadron. The three were eating sandwiches and discussing the hearing while awaiting completion of the IRO's report. As they talked, the appellant commented that "he didn't even own a weapon" or words to that effect.[8]

While the appellant was in pretrial confinement, members of his command obtained authorization to search his car, which was parked on base. On 22 June 2012, they executed a search of the vehicle. In a green storage bin located in the trunk, they found a .45 ACP pistol and .038 pistol, each with a loaded magazine inserted and an additional 50 rounds of .45 ACP ammunition in a carrying case.

At trial, the appellant faced charges for communicating a threat to EB on 1 April 2012 and two specifications of assault and battery of EB on 10 June 2012;[9] one specification for making a false official statement for his comment following the IRO hearing; and four specifications of 18 U.S.C. § 922(g)(9) for wrongfully possessing two firearms and ammunition in the trunk of his car.[10]

### Improper Character Evidence

---

[8] *Id*. at 308.

[9] The military judge later consolidated these offenses prior to findings. *Id*. at 461-62.

[10] These four specifications were all charged under clauses (1), (2) and (3) of Article 134, UCMJ. The clause (3) offenses were pleaded as violations of Title 18 U.S.C. § 922(g)(9) ("Lautenberg violations"), which prohibits anyone with a misdemeanor conviction for domestic violence from possessing, shipping, transporting, or receiving any firearm or ammunition. Effective 30 September 1996, this provision was added to The Gun Control Act of 1968 through legislation sponsored by the late Sen. Frank Lautenberg (D-NJ). *See* 104 P.L. 208, § 658. The specification for wrongfully possessing .45 ACP ammunition was later dismissed by the military judge under RULE FOR COURTS-MARTIAL 917, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). Record at 467-68. The members found the appellant guilty of the two specifications involving possession of a firearm and not guilty of sole remaining specification involving possession of .380 ammunition. *Id*. at 515.

4

In light of several evidentiary challenges, the Government served notice to the defense of evidence it intended to offer at trial pursuant to MIL. R. EVID. 404(b). This evidence consisted of previous domestic disturbance calls to 911 and the above incident involving Mr. G. During the pretrial motion hearing, the Government argued that the previous 911 calls and related police reports provided evidence of the appellant's intent and plan to abuse his wife, and further defeated any accidental cause of EB's injuries on 10 June 2012.[11]

The Government then posited that the incident involving Mr. G revealed the appellant's knowledge of and intent to possess one of the firearms later recovered from his vehicle. This was due to the similarity between the pistol Mr. G described and the one later recovered from the appellant's vehicle.[12]

Ultimately, the military judge agreed, concluding that the brandishing of a firearm was relevant to show knowledge to rebut any claim of mistake or accident concerning the Lautenberg violations. Similarly, he concluded that the previous 911 calls were relevant to rebut any claim of mistake or accident on the charge of spousal battery. The military judge also concluded that this evidence was not substantially outweighed by the danger of unfair prejudice.

## A. Principles of Law

We review a military judge's evidentiary rulings for an abuse of discretion.[13] When a military judge balances the competing interests in admitting or excluding evidence, we will give great deference to a clearly articulated basis for his

---

[11] Appellate Exhibit XVI at 5-6. Trial counsel argued that these previous instances of "domestic abuse" were relevant to the appellant's knowledge and intent to physically injure his wife without leaving signs of visible abuse. Record at 86. Although originally described as four previous occasions, the military judge later clarified that the trial counsel was referring to three previous instances where police were called over a report of a domestic disturbance: 2 January 2011, for which the appellant was later convicted of assault of a female in Onslow County, North Carolina; 31 July 2011 and 28 April 2012. *Id*. at 86–92. At trial, the Government never offered any evidence concerning a domestic disturbance on 31 July 2011.

[12] AE XVI at 5. At trial, Mr. G testified that the pistol the appellant pointed at him was "a black 9[mm] or .45, one of the two." Record at 394.

[13] *United States v. Thompson*, 63 M.J. 228, 230 (C.A.A.F. 2006).

decision.  Conversely, when there is no such clearly articulated basis, we will be less deferential in our review.[14]

Evidence of uncharged misconduct is not admissible to prove the character of an accused or show that the accused acted in conformity with a certain character trait.  But evidence of uncharged misconduct may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, mistake, or accident.[15]

The three-part test for admitting evidence under MIL. R. EVID. 404(b) is set forth in *United States v. Reynolds,* 29 M.J. 105, 109 (C.M.A. 1989).  First, the evidence must reasonably support a finding that the appellant committed prior crimes, wrongs, or acts.  Second, the evidence must show a fact of consequence is made more or less probable by the existence of this evidence.  Third, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice.  *Id.; see also United States v. Barnett*, 63 M.J. 388, 394 (C.A.A.F. 2006).

**B. The 2011 Misdemeanor Conviction and the 911 Calls of 1 April 2012, 28 April 2012 and 10 June 2012**

During direct examination, the trial counsel posed several questions to EB concerning the appellant's 2011 arrest and conviction in Onslow County, North Carolina.  EB admitted that she knew her husband was convicted of a crime of domestic violence but was unaware it prohibited him from owning or possessing any firearm.[16]  Trial counsel then queried EB on her 911 call of 1 April 2012, where she reported that her husband threatened to kill her; her neighbor's call to 911 on 28 April 2012 reporting spousal abuse; and EB's 911 call on 10 June 2012 when she reported domestic violence.  Many of EB's responses were noncommittal or less than forthcoming.

On the Lautenberg violations, EB described how she purchased a .45 caliber pistol from a local firearms dealer based on the recommendation of her husband.  Evidence revealed that her husband in fact attempted to purchase the same model weapon, a Rock Island 1911 .45 ACP, from the same dealer approximately one week earlier, but was unable to do so because

---

[14] *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000).

[15] MIL. R. EVID. 404(b).

[16] Record at 343-44; PE 21.

6

of his disqualifying conviction.[17] EB testified that she was unaware of her husband's earlier unsuccessful efforts and that she only purchased the weapon for herself.

She also described how in May or June of 2012, she drove his car to the local Wal-Mart. There she placed her pistol in her purse before she went inside the store. When she came out, she removed the pistol from her purse and placed it in the trunk. She then testified that she ultimately left it in the trunk and failed to inform her husband.[18]

When pressed by the trial counsel for details of her husband's actions on 10 June 2012, EB denied that he ever punched or kicked her. She was evasive, despite trial counsel's reference to the 911 call where she told the operator that she wanted to "report a domestic violence" by her husband who "jumped on [her] and stuff."[19] She did concede that she "might have been stepped on" and that she might have been struck by the front door when the appellant shoved his way inside.[20] Trial defense counsel later described this as a "tussle" during argument[21] and the military judge instructed the panel on the defenses of accident and self-defense.[22]

Turning to MIL. R. EVID. 404(b), we begin by noting that some of this evidence proffered by the Government and admitted by the military judge was either direct evidence or intrinsic thereto of an element of a charged offense. In that vein, we find that EB's testimony concerning her 911 call on 1 April 2012 and the recording itself, and her testimony concerning the appellant's conviction in Onslow County, North Carolina inapt to our MIL. R. EVID. 404(b) analysis.[23]

---

[17] *Id.* at 292, 345-46; PE 10, 11.

[18] Record at 344-49.

[19] *Id.* at 352-54; PE 8.

[20] Record at 352-60.

[21] *Id.* at 486-87.

[22] *Id.* at 498-99.

[23] *See United States v. Doss*, 15 M.J. 409, 412 n.5 (C.M.A. 1983) (recognizing as a general rule that evidence as to uncharged misconduct "will be admissible, if it is part of the same transaction as the crimes with which the accused is charged") (citing *United States v. Thomas*, 11 M.J. 388, 392-93 (C.M.A. 1981)).

However, we find that the military judge erred in admitting the neighbor's call to 911 on 28 April 2012 and the related testimony by EB for the purposes offered by the Government and ostensibly relied upon by the military judge.[24] While EB's testimony raised the issue of accidental injuries and the military judge instructed the panel accordingly, the 911 call of 28 April 2012 provided little rebuttal value to EB's testimony that her injuries could have been caused by the apartment door or during a scuffle over the appellant's cell phone. The neighbor who called 911 provided no specific details as to what happened, what injuries resulted, or who was responsible. This evidence only provided a generalized picture of domestic disturbance that the Government later cast as proof of an ongoing pattern of spousal abuse at the hands of the appellant.[25]

Furthermore, the military judge's limiting instruction at the beginning of presentation of evidence and during his instructions on findings offered little guidance on filtering out any impermissible implication raised.[26] The only 404(b) theories relied upon by the military judge were accident with respect to the spousal battery offense and knowledge with respect to the Lautenberg violations. The Government never raised and the record reveals no issue of identity, motive or opportunity with respect to any offense. Yet the military judge instructed the panel that they could consider this evidence for those purposes and in doing so he erred. *See Thompson*, 63 M.J.

---

[24] The military judge concluded that evidence of previous incidents of domestic violence would rebut any claim of mistake or accident in the charged offense of assault and battery of EB on 10 June 2012. AE XLVII at 6. The military judge made no reference to the Government's additional theory that this evidence showed an intent and plan to physically abuse EB without leaving any telltale signs.

[25] Record at 281, 478. The Government also called a forensic psychologist who testified to the "ongoing cycle of violence" phenomenon in battered spouse cases, and that in her opinion the abuse to EB "seems to be increasing in terms of 911 calls and threats of violence." *Id*. at 433, 442-443.

[26] *Id*. at 281-84, 475-84. During his findings instructions, the military judge advised the members that they may consider evidence of "alleged incidents on 2 January 2011, 31 [July] 2011, and 28 April 2012 between the [appellant] and [EB], as well as the alleged incident on 29 April 2012 between the [appellant] and Mr. [G] for the limited purpose of its tendency, if any, to identify the [appellant] as the person who committed the offenses alleged . . . . [or] to prove a plan or design by the [appellant] to engage in the charges and specifications . . . . [or] to prove[] knowledge and intent . . . [or] motive and opportunity to commit the offenses before you." He then proceeded to caution against using this evidence to infer any general criminal tendency. *Id*. at 504.

at 231 (finding error when a military judge admits 404(b) evidence for purposes not relevant at trial).

We also find that the military judge erred in his MIL. R. EVID. 403 balancing.  First, we note that his balancing, articulated only in his written ruling attached to the record a month after trial (Appellate Exhibit XLVII), merely recites the rule.  Therefore, we afford his ruling less deference than we might otherwise.[27]  The ruling does not articulate the probative value, the attendant prejudice, or any balancing except to note that any concern of such prejudice or confusion could be remedied through a proper limiting instruction.  As noted earlier, the limiting instruction given only added to, rather than lessened, the risk of confusion and prejudice.

Here, the probative value of an uncharged domestic disturbance was relatively low since the Government already admitted evidence of domestic disturbances on 2 January 2011 and the two charged occasions: 1 April 2012 and 10 June 2012. Little was gained by admitting another 911 call concerning a fourth domestic incident.  With so little probative value, the risk of unfair prejudice rises where the Government painted the appellant as an abusive husband with increasingly broad brush strokes.

## C. Mr. G's Testimony

The admission of evidence concerning the uncharged incident of 29 April 2012 is more troubling.  A former Marine and an acquaintance of the appellant, Mr. G testified that he went to the house of Ms. R, someone with whom he previously had an intimate relationship, that Sunday morning to take their daughter to church.  When he arrived, he recognized the appellant's car parked outside.  After knocking on the door, Ms. R turned him away because, as Mr. G explained at trial, she and the appellant were "having relations at the time."[28]  Mr. G then left.

Approximately 30 minutes later, he returned, this time to be accosted by the appellant who "came outside . . .[with] a gun in his hand.  He cocked the gun.  He brandished the gun at [him], walked around [him], saying a couple of words."[29]  Moments later Mr. G explained that the appellant said "act tough now"

---

[27] *Barnett*, 63 M.J. at 396.

[28] Record at 394.

[29] *Id*. at 392-93.

and that he "cocked his gun and he pointed it at [him] . . . [from] [p]robably eight feet [away]."[30] Mr. G described the weapon in the appellant's hand that day as "a black 9[mm] or a .45, one of the two."[31]

EB's testimony that she purchased the Rock Island .45 ACP and that she put it in the trunk of the appellant's car reasonably raised the issue of the appellant's knowledge, at least as to possession of the .45. Therefore, Mr. G's testimony putting a similar weapon in the appellant's hand a month and a half earlier had some probative value. Our concern, however, is solely with the third *Reynolds* prong and the highly prejudicial circumstances surrounding this incident placed squarely before the members.

Prejudice in the context of MIL. R. EVID. 403 is defined as the "'capacity of some concededly relevant evidence to lure the *factfinder* into declaring guilt on a ground different from proof specific to the offense charged.'"[32] Despite the defense pretrial motion raising this concern, the military judge displayed very little sensitivity to potential prejudice arising from this evidence. He articulated no balancing on the record at the time of his ruling, and his written findings and conclusions attached to the record after trial give little insight. Consequently, we grant less deference.[33]

The only issue in dispute was whether the appellant knew that the two pistols and ammunition were in the trunk of his car. But any limited inferential value of Mr. G's testimony was quickly overwhelmed amidst details of a cheating husband and an aggressive provocateur threatening Mr. G with a presumably loaded pistol. The unfair prejudice arising from these unnecessary and inflammatory details far outweighed the similarity between this "9 or .45" and the .45 ACP later seized from the appellant's car. Furthermore, the military judge's overly expansive limiting instruction made matters worse.

Considering that the trial counsel highlighted the appellant's provocative and belligerent response to Mr. G during

---

[30] *Id*. at 394, 398.

[31] *Id*. at 394.

[32] *United States v. Collier*, 67 M.J. 347, 354 (C.A.A.F. 2009) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)).

[33] *United States v. Berry*, 61 M.J. 91, 96 (C.A.A.F. 2005).

10

both opening statement and closing argument,[34] the risk of improper influence upon the members from this evidence is simply too great.[35] Applying the appropriate amount of deference, we find that the military judge erred in his MIL. R. EVID. 403 balancing test by admitting these highly prejudicial details in Mr. G's testimony that offered no probative value.

## D. Material Prejudice

Having determined that the military judge abused his discretion by admitting evidence of the 911 call on 28 April 2012 and the incident with Mr. G, we must determine next whether these errors materially prejudiced the substantial rights of the appellant.[36] For errors of a non-constitutional dimension, the Government bears the burden of demonstrating that the error did not substantially influence the findings or sentence.[37] We make our determination by evaluating: "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question."[38]

The Government's case overall was strong. The only disputed issue as to the Lautenberg offenses was the appellant's knowledge of possession. Evidence was admitted showing that he attempted to purchase the very same .45 ACP nine days before his wife's successful purchase of the same type of firearm. Although EB testified that the .45 ACP was "hers" and that she placed it in the appellant's trunk without his knowledge, her testimony lacked credibility. As to the remaining .380 pistol, knowledge of possession was not reasonably in dispute since a witness testified placing that weapon in the appellant's trunk

---

[34] Record at 281-82, 478-79. Trial counsel highlighted the aggressive nature of the appellant's conduct arguing "and the [appellant] does not care for [Mr. G's interruption], because he and Ms. [R] apparently need their alone time. So he comes out the front door and points a .45 at Mr. [G's] chest. Not only does he point it at him, but Mr. [G] can hear it cocked. And Mr. [G] testified, he then told him, 'Act tough now, act tough now.'" *Id.* at 478-79.

[35] "[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton v. United States*, 391 U.S. 123, 135 (1968) (citations omitted).

[36] Art. 59(a), UCMJ.

[37] *Berry*, 61 M.J. at 97.

[38] *Barnett*, 63 M.J. at 397 (quoting *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999)).

11

with his permission.  Finally, witnesses from the appellant's command described the appellant's earlier suspicious behavior when they escorted him to retrieve some personal items from the trunk of his car.

On the remaining offenses for assaulting and threatening EB, the Government's case was still strong despite EB's often inconsistent and uncooperative testimony.  EB did admit that her husband "threatened to shoot [her]" and "at the time, [she] thought he was serious, but now [she doesn't] believe he would do it."[39]  Her 911 call of 1 April 2012 played for the members corroborated this testimony.  While she was uncooperative at times with the trial counsel, her obvious bias toward her husband enhanced her credibility on the points of her testimony that aligned with the Government's theory.

The defense case, on the other hand, was not as strong. Trial defense counsel rested without presenting any case-in-chief, instead relying on cross-examination, the presumption of innocence, and the burden of proof.

Evidence of the appellant's predisposition, however, whether in the form of uncharged acts of domestic disturbance or evidence of a violent character as seen through Mr. G's testimony, went directly to a principal issue in the case; the appellant's abusive nature toward his wife.  Indeed, the appellant's abuse of his wife was the focus of the Government's forensic psychologist who testified to the common characteristic of a battered spouse and the increasing risk of abuse to EB. True, trial defense counsel referred to the altercation between EB and the appellant as a "tussle" and the military judge instructed the panel on the defenses of accident and self-defense.  But the Government effectively handed the members a canvas with the appellant painted as an abusive and aggressive individual prone to extreme responses to seemingly mild provocation.  This evidence is exactly the type of "new ammunition" on a fact at trial that increases the risk of prejudicial error.[40]

The role this evidence played at trial, particularly the incident with Mr. G, was significant.  During closing argument,

---

[39] Record at 350.

[40] *See United States v. Yammine*, 69 M.J. 70, 78 (C.A.A.F. 2010) (distinguishing between a "fact already obvious from . . . testimony at trial" and evidence that provides "new ammunition" the latter increasing the chances of prejudicial error) (internal quotation marks and citation omitted).

trial counsel mentioned both the 28 April 2012 911 call and Mr. G's testimony. Regarding Mr. G, the trial counsel recounted the whole story, emphasizing that in order to secure his "alone time" with Ms. R, the appellant pointed and cocked a ".45" at Mr. G's chest.[41] In rebuttal argument, trial counsel reiterated the theme of ongoing violence in the marriage citing their forensic psychologist's testimony describing a "cycle of violence."[42] The total effect was to paint a picture, reinforced by expert testimony, that the appellant had an abusive and violent nature, and thus more likely acted in conformity therewith.

This picture of an abusive and violent predisposition carried over into sentencing. In arguing for sentence, the assistant trial counsel alluded to the appellant's unsavory nature and argued that five year's confinement would send a message to other Marines:

> that [sic] may like to dabble in *some sort of lifestyle*, you know, trying to be something that they're not supposed to be, not a stand-up guy in a Marine [sic] and a father and a husband, *but a punk running around with weapons loaded*, acting foolish, doing things that sully our reputation, our uniform, and our standards.[43]

The members then returned a sentence of fifteen year's confinement – tripling the Government's recommended sentence of five years.

Given the inflammatory nature of Mr. G's testimony, the Government's emphasis on the unnecessary and prejudicial details it offered, and the military judge's erroneous limiting instruction, we conclude that the Government has not met its burden of establishing that the improperly admitted evidence did "did not have a substantial influence on the findings."[44] We also find the error materially prejudiced the sentence.

## False Official Statement

---

[41] Record at 478.

[42] *Id.* at 491.

[43] *Id.* at 523 (emphasis added).

[44] *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003) (citation omitted).

We next turn to the question of the appellant's conviction for his statement to Gunnery Sergeant (GySgt) N and GySgt T, following his IRO hearing, that "he didn't even own a weapon." We review factual and legal sufficiency *de novo*.[45] The test for legal sufficiency is whether, "considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt."[46] For factual sufficiency, we must be ourselves convinced of the appellant's guilt beyond a reasonable doubt taking into account that the trial court saw and heard the witnesses.[47]

Article 107, UCMJ, criminalizes the making of false official statements. "[T]o determine whether a false statement is official, or capable of perverting authorized military functions, 'the critical distinction is . . . . whether the statements relate to the official duties of either the speaker or the hearer . . . .'"[48]

Shortly before calling GySgt T, trial counsel proffered that GySgt T was "the Legal Officer of . . . VMFA-312 [and] was executing [his] duties per the IRO hearing" when the appellant allegedly made his statement.[49] However, when GySgt T took the stand his testimony took a slightly different turn. He testified that this conversation occurred following the IRO hearing, back at the command headquarters. The appellant, GySgt T, and GySgt N were sitting in GySgt T's office eating sandwiches while awaiting the completion of the IRO's report. GySgt T described the conversation as follows:

> As we were sitting there eating, we were sort of going over some things that were said in the hearing and Gunnery Sergeant [N] and I were just trying to get a grasp on what was going on and different things of that nature and you know, we didn't – we never read

---

[45] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[46] *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citing *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)).

[47] *Washington*, 57 M.J. at 399; *see also* Art. 66(c), UCMJ.

[48] *United States v. Spicer*, 71 M.J. 470, 474 (C.A.A.F. 2013) (quoting *Day*, 66 M.J. at 174).

[49] Record at 304.

him his rights because we weren't questioning him. We were just talking to him trying to make sure that we, as his Staff NCOS, were taking care of him. And we were sort of going over what was [] said in the hearing and [the appellant] was saying different things and then one of the things that he said was, 'They brought up me yielding a weapon in 2008 and I don't even own a weapon.' So, you know, which made us think, like I said, we were just trying to figure out what was going on, what was our best course of action to help him and things of that nature.[50]

When GySgt N took the stand, he corroborated much of GySgt T's testimony. However, on cross-examination, he described a conversation whereby GySgt T asked the appellant if "he had anything illegal" in his car and likened the conversation to "an amnesty period."[51]

While these conflicting accounts paint a confusing picture of what exactly was said, the two clearly had an official duty to keep custody of the appellant. But an informal conversation over sandwiches, one that GySgt T characterized as having nothing to do with his function as the legal officer, bore no bearing to any dialogue necessary to the appellant's detention.

We therefore conclude that this statement lacked officiality within the meaning of Article 107, UCMJ. The appellant's conviction for making a false official statement is therefore legally insufficient.

**Conclusion**

The findings and sentence are set aside. Charge II and its sole specification (false official statement) are dismissed with prejudice. The record of trial is returned to the Judge

Advocate General of the Navy. A rehearing on the remaining charges is authorized.

---

[50] Moments later, GySgt T confirmed that he was not acting in his duties as the command legal officer when the appellant made this statement. *Id*. at 308-09.

[51] *Id*. at 338.

15

Judge MCFARLANE and Judge MCDONALD concur.

For the Court


R.H. TROIDL
Clerk of Court