****CORRECTED COPY – DESTROY ALL OTHERS****

# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

**v.**

## Captain JASON L. BANEGAS
### United States Air Force

## ACM 38569

## 13 August 2015

Sentence adjudged 17 December 2013 by GCM convened at Royal Air Force Mildenhall, United Kingdom. Military Judge: Christopher F. Leavey (sitting alone).

Approved Sentence: Dismissal and confinement for 18 months.

Appellate Counsel for the Appellant: Major Anthony D. Ortiz.

Appellate Counsel for the United States: Major Daniel J. Breen; Major Matthew J. Neil and Gerald R. Bruce, Esquire.

Before

ALLRED, HECKER, and TELLER
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

TELLER, Judge:

The appellant was convicted by a general court-martial comprised of a military judge alone, contrary to his pleas, of aggravated assault and two specifications of assault consummated by a battery in violation of Article 128, UCMJ, 10 U.S.C. § 928.[1] He was also convicted, in accordance with his plea, of assault, also in violation of Article 128,

---

[1] For the aggravated assault specification, the appellant pled guilty to the lesser included offense of assault consummated by a battery. Following a litigated trial, the appellant was convicted of the greater offense.

UCMJ. The court sentenced him to dismissal and 18 months confinement. The sentence was approved, as adjudged.

The appellant argues that: (1) the assault and aggravated assault convictions are multiplicious or an unreasonable multiplication of charges as they were part of one transaction; (2) the military judge erred by admitting a prosecution exhibit when the optical disc proffered and included in the record as the exhibit in fact contained photos in addition to the video admitted as the prosecution exhibit; (3) the military judge erred by allowing improper character evidence; (4) the evidence was legally and factually insufficient to sustain the aggravated assault conviction; (5) the military judge erred when he determined certain pretrial restrictions placed on the appellant were not tantamount to confinement; and (6) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), the military judge erred by failing to grant additional pretrial punishment credit when the appellant was not reimbursed for lodging expenses he incurred during the Article 32, UCMJ, 10 U.S.C. § 832, hearing in his case. Finding no error that materially prejudices a substantial right of the appellant, we affirm the findings and sentence.

*Background*

The charges in this case arose after the appellant and a fellow officer, First Lieutenant (1st Lt) JK, met two Airmen and a civilian woman outside a base club at Royal Air Force (RAF) Mildenhall in the United Kingdom on 12 May 2013, after all had been drinking in the club. The appellant was ultimately convicted of assaulting these individuals.

The group decided to go play pool at the dayroom of a nearby dormitory. Due to the intoxication of all of the witnesses, the details of what ensued at the dayroom are unclear. A recording system captured video of the events but did not record any sound.

During the first 44 minutes following their arrival at the dayroom, the group played pool and engaged in conduct, such as mock swordplay, that, despite being generally harmless, involved some degree of physical contact. While the lack of sound makes it difficult to judge, we also find that there was some verbal teasing as well, with at least some of it directed at the appellant. For example, trial defense counsel elicited testimony that one victim, Ms. SG, made assertions that "she had some connections, or some relatives that she insinuated . . . could get rid of Captain Banegas and that could harm his family," and that she asked one of the other Airmen in the dayroom if "he would be able to take care of" the appellant. Since we are convinced that such statements, even in the unlikely event they were made in earnest, would not give rise to a defense of self-defense or defense of others, we reach no findings as to the actual substance of any such comments.

During the 15 minutes preceding the assault on her, Ms. SG engages in what can best be described as physical horseplay. Despite the appellant's suggestions that

Ms. SG's actions during this time were threatening, the video clearly shows her smiling and engaging in the same type of contact with others and shows the appellant continuing to play "keep away" from her with first her phone and then a cigarette.

In the moments preceding the incident, the appellant, 1st Lt JK, and the two battery victims, Ms. SG and then-Senior Airman (SrA) WW, can be seen clustered in the corner of the dayroom just under the camera. The appellant is holding two bottles of beer in his left hand and a cigarette in his right, with the cigarette held above his head out of reach of Ms. SG. SrA WW, who had previously been sitting across the room, came over at the apparent prompting of Ms. SG. For over a minute prior to the assault, SrA WW can be seen leaning against the wall in close proximity to the appellant, and at one point he briefly took a cellular phone out of his pocket.

At the inception of the attack, the video shows SrA WW's arms crossed in front of his chest. Ms. SG, while also standing close to the appellant, had her hands on her hips. The video shows the appellant reach forward with his right hand, place it on the back of SrA WW's neck, and head-butt SrA WW in the head. The appellant almost instantaneously turned to Ms. SG and head-butted her, knocking her to the ground with the head strike and his body weight, then falling with his knees on top of her body. Without dropping the bottles of beer in his left hand, the appellant grabbed Ms. SG's head by the hair and, kneeling on one knee beside her, began slamming her head against the floor. Although the speed and violence of the attack makes the video appear jagged, one can distinguish the appellant lifting Ms. SG's head and striking it against the floor approximately six times in about eight seconds.

Another Airman, then-Airman First Class (A1C) CJ, intervened from across the room in an effort to stop the assault of Ms. SG, but the appellant comes after him, swinging his arms and closed fists at A1C CJ. The Airman deflects the swing and the appellant returned to grab the hair of a motionless Ms. SG and strike her head against the floor a final time. A1C CJ again intervenes and, this time, the appellant is pushed out of the room. He returns to stand in the doorway, yelling and pointing at the group inside the room.

The appellant pled guilty to assaulting A1 CJ by swinging his arms and closed fists at the victim. He also pled guilty to assault consummated by a battery for "repeatedly shaking [Ms. SG's] head," but the military judge convicted him of aggravated assault for "repeatedly slamming her head against the floor" with a force likely to produce death or grievous bodily harm. The military judge also convicted the appellant of two specifications of assault consummated by a battery for the appellant's head-butting of Ms. SG and SrA WW.

*Multiplicity and Unreasonable Multiplication of Charges*

As he did at trial, the appellant contends the assault and aggravated assault convictions regarding Ms. SG are multiplicious or an unreasonable multiplication of charges as they were part of one transaction. Multiplicity is reviewed de novo. *United States v. Roderick,* 62 M.J. 425, 431 (C.A.A.F. 2006). "A military judge's decision to deny relief for unreasonable multiplication of charges is reviewed for an abuse of discretion." *United States v. Campbell*, 71 M.J. 19, 22 (C.A.A.F. 2012). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion." *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000). "[O]n a mixed question of law and fact . . . a military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect." *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995).

In *Campbell*, the Court of Appeals for the Armed Forces discussed the distinction between multiplicity, unreasonable multiplication of charges for findings, and unreasonable multiplication of charges for sentencing. The court clarified that "there is only one form of multiplicity, that which is aimed at the protection against double jeopardy as determined using the *Blockburger/Teters* analysis." *Campbell*, 71 M.J. at 23 (referring to *Blockburger v. United States*, 284 U.S. 299 (1932), and *United States v. Teters*, 37 M.J. 370 (C.M.A. 1993)). *Blockburger* provides that when "the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger,* 284 U.S. at 304.

The specifications at issue here are clearly not multiplicious. The assault consummated by a battery specification requires proof that the appellant hit the victim in the head with his own head. In contrast, the aggravated assault specification requires proof that the appellant struck the victim's head against the floor. Each requires proof of a fact the other does not.

Even where charges are not multiplicious in the sense of due process, "the prohibition against unreasonable multiplication of charges has long provided courts-martial and reviewing authorities with a traditional legal standard—reasonableness—to address the consequences of an abuse of prosecutorial discretion in the context of the unique aspects of the military justice system." *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001). Rule for Courts-Martial (R.C.M.) 307(c)(4) is the current regulatory expression of that prohibition, directing "[w]hat is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person."

In *Campbell*, our superior court articulated four factors a trial court must evaluate in ruling on such motion:[2]

> (1) whether each charge and specification is aimed at distinctly separate criminal acts,
>
> (2) whether the number of charges and specifications misrepresent or exaggerate the accused's criminality,
>
> (3) whether the number of charges and specifications unreasonably increase the accused's punitive exposure, or
>
> (4) whether there is any evidence of prosecutorial overreaching or abuse in the drafting of the charges.

*Campbell*, 71 M.J. at 24.

*Campbell* and *Quiroz* directly address a specific kind of unreasonable multiplication of charges—the multiplication that may occur when conduct potentially violates more than one statutory provision. The facts of this case raise a slightly different unreasonable multiplication problem—the potential prosecutorial abuse that may occur when discrete acts, motivated by a single impulse, occur over a short period of time yet are charged as individual offenses. Particularly in the context of a single uninterrupted assault, our superior court has held that it is incumbent upon reviewing authorities to consolidate or dismiss such unreasonably multiplied charges. *United States v. Morris*, 18 M.J. 450, 450 (C.M.A. 1984) ("When Congress enacted Article 128, it did not intend that, in a single altercation between two people, each blow might be separately charged as an assault."); *see, e.g., United States v. Rushing*, 11 M.J. 95, 98 (C.M.A. 1981) (holding two assault specifications multiplicious where the acts "were so united in time, circumstance, and impulse in regard to a single person as to constitute a single offense"). We must first decide, therefore, whether the factors articulated in *Quiroz* and applied to the trial level in *Campbell*, should be used in such a scenario, or whether the focus remains on evaluating if the assault was uninterrupted or united in time, purpose, and impulse, as was done in *Morris* and *Rushing*.

Neither *Morris* nor *Rushing* suggest the court intended to distinguish assault cases from unreasonable multiplication more broadly. In *Morris*, the court cited *United States*

---

[2] The four factors articulated in *United States v. Campbell*, 71 M.J. 19 (C.A.A.F. 2012), are directly derived from the factors appellate courts apply under *United States v. Quiroz*, 55 M.J. 334 (C.A.A.F. 2001). As the court noted in *Campbell*, "The first factor adopted in [*Quiroz*], whether the accused objected, is an important consideration for appellate consideration. 55 M.J. at 338. However, it is omitted here because a military judge will invariably be addressing the issue in the context of an objection." *Campbell*, 71 M.J. at 24 n10. We find no legally significant difference between references to *Quiroz* or *Campbell* factors at the trial level.

*v. Baker*, 14 M.J. 361 (C.M.A. 1983),[3] and *United States v. Doss* 15 M.J. 409 (C.M.A. 1983), in support of its holding. 18 M.J. at 450. Both cases were of the same type as *Quiroz* and *Campbell*, cases that dealt with the application of different statutory provisions to the same underlying conduct. *Doss* also relied extensively on the predecessor to R.C.M. 307(c)(4), which at that time gave three examples of unreasonable multiplication:

> A person should not be charged with both disorderly conduct and assault if the disorderly conduct consisted in making the assault, or with both a failure to report for a routine scheduled duty, such as reveille, and with absence without leave if the failure to report occurred during the period for which he is charged with absence without leave. The larceny of several articles should not be alleged in several specifications, one for each article, when the larceny of all of them can properly be alleged in one specification. If a person willfully disobeys an order to do a certain thing, and persists in his disobedience when the same order is given by the same or other superior, a multiplication of charges of disobedience should be avoided.

*United States v. Doss*, 15 M.J. 409, 411 (C.M.A. 1983). *Morris* similarly cited the larceny example above in consolidating the assault charges in that case without distinguishing that type of unreasonable multiplication of charges from the type illustrated by the other two examples. *Morris*, 18 M.J. at 450.

*Rushing* reached the conclusion that the allegations constituted one offense in a more summary fashion, but cited two different cases, *United States v. Stegall*, 6 M.J. 176 (C.M.A. 1979), and *United States v. Meyer*, 45 C.M.R. 84 (C.M.A. 1972). 11 M.J. at 98. In *Stegall*, the court consolidated two charges: "(1) unlawfully striking the first sergeant with a cane . . . and (2) assaulting the first sergeant, his superior noncommissioned officer who was in the execution of his office" on due process multiplicity grounds, holding that the battery offense was a lesser included offense of striking a noncommissioned officer in the execution of his office. *Stegall*, 6 M.J. at 177. Unlike *Stegall*, *Baker*, and *Doss*, *Meyer* dealt with multiple offenses of the same type charged as discrete offenses. In *Meyer*, the court "assume[d], without deciding, that separate acts of misconduct can become so connected in place, circumstances, and time as to merge into a single offense," but held that the possession of various drugs obtained at different times and stored in different locations in the searched premises did not lead to such a conclusion. 45 C.M.R. at 86. In summary, the cases predating *Quiroz* and *Campbell* that consolidated multiple assault offenses into a single assault offense did so on the basis of

---

[3] The due process multiplicity "fairly embraced" test adopted in *United States v. Baker*, 14 M.J. 361 (C.M.A. 1983), was later overruled by *United States v. Teters*, 37 M.J. 370, 376 (C.M.A. 1993).

unreasonable multiplication of offenses broadly, not on a special rule intended to apply only to uninterrupted assaults.

More importantly, *Campbell* specifically deprecated the analysis reflected in *Morris* and *Rushing* as it applied to unreasonable multiplication of charges.

> Until now, military judges have used the Discussion to R.C.M. 1003(c)(1)(C) to determine whether relief on sentencing is warranted under the rubric of "multiplicity for sentencing." That Discussion suggests that relief is warranted where multiple charges reference "a single impulse or intent," or reflect "a unity of time" with a "connected chain of events." However, these terms do not derive from the traditional legal test for multiplicity found in *Blockburger* and *Teters*. Rather, they better describe the sort of factors found in *Quiroz* for determining *when the charges, sentencing exposure, or both, unduly exaggerate an accused's criminality*. After *Quiroz*, in military practice that is known as unreasonable multiplication of charges. Moreover, the *Quiroz* factors offer greater clarity than the Discussion to R.C.M. 1003(c)(1)(C).

*Campbell* 71 M.J. at 24 (emphasis added).

Accordingly, we find that the *Campbell* factors comprise the appropriate analytical framework at trial for deciding whether the two specifications in this case constituted an unreasonable multiplication of charges for the purposes of both findings and sentencing.

Prior to the entry of pleas, the military judge applied the *Quiroz* framework and denied any relief for unreasonable multiplication of charges, stating:

> I conclude the following: The specifications address similar, but distinct, concerns by Congress. Specification 2 alleges a simple assault and battery. Specification 3 alleges an assault and battery with a force likely to produce death or grievous bodily harm. Specification 3 addresses more serious misconduct and the maximum punishment reflects this. I note that Specification 2 is not [a lesser included offense] of Specification 3. Specification 2 alleges one means of harm, i.e., a head-butting. Specification 3 alleges a distinct means of administering harm, i.e., striking the victim's head against the floor.

I also note that one of the strik[es] of the head to the floor, alleged in Specification 3[,] occurred after a brief respite in the assault, where the accused allegedly was interrupted in his assault, engaged in another assault, and then returned to this victim.

Having considered all of these and addressed these with regards to *Quiroz*, and certainly noting that the defense has made an objection in a timely manner, I find that the defense motion to dismiss or for other appropriate relief under the theory of multiplicity is denied.

As for unreasonable multiplication of charges, as for findings, any relief is similarly denied.

As part of this ruling, the military judge reserved ruling on whether the specifications were unreasonably multiplied for purposes of sentencing. After the findings had been entered, the military judge again considered the *Quiroz* factors and denied any relief for sentencing. Therefore, the appellant faced 36 months of confinement for the aggravated assault of Ms. SG and 6 months for the assault consummated by a battery on her.

We find no abuse of discretion in the military judge's analysis. His finding that forcefully striking the victim's head against the floor was a distinct criminal act from a head-butt based on the likely level of harm was not arbitrary or capricious. He also noted that the appellant resumed his attack on a then-helpless Ms. SG after leaving her to assault a third-party who tried to intervene. The military judge could reasonably give substantial weight to this interruption and resumption of the attack in determining whether the charges exaggerate the appellant's criminality or whether the increase in punitive exposure was unreasonable. The military judge applied the correct law, and his findings of fact were not clearly erroneous. The denial of the motion was within his discretion and this assignment of error is without merit.

*Admission of the Optical Disc as Prosecution Exhibit 1*

The appellant next argues the military judge committed plain error when he admitted Prosecution Exhibit 1, a disc containing videos of the alleged assault as well as pictures taken within the course of investigation, when the prosecution's foundational witness only possessed knowledge of the videos.

When an appellant fails to raise a timely objection to evidence, appellate courts apply a plain error standard of review. *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014). The requirement for a timely and specific objection reduces unnecessary appellate litigation by bringing potential error to the attention of the military judge in time to correct it. *Id*. Under plain error review, the appellant has the burden of

showing there was error, that the error was plain or obvious, and that the error materially prejudiced a substantial right of the appellant. *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011).

During the testimony of the dormitory manager, the trial counsel attempted to lay the foundation for Prosecution Exhibit 1, which he described as a DVD containing video footage from the surveillance camera in the dormitory dayroom. After the trial counsel played a recording from that DVD for the dormitory manager, the manager stated the video was a fair and accurate depiction of the dayroom; it contained a time stamp, and was part of the video the witness retrieved from secure storage. The military judge admitted the DVD into evidence, over a defense objection on the basis of "preservation of the video." There was no inquiry into what files, other than the video shown to the foundation witness, were contained on the DVD.

The government later sought to play Prosecution Exhibit 1 in open court. The record of trial gives the impression a single hour-long video recording was played. There was no discussion about whether the DVD contained additional files. There is also no indication whether the military judge took Prosecution Exhibit 1 into his deliberations.

Finally, after announcement of sentence and just prior to closing the court-martial, the military judge raised the contents of Prosecution Exhibit 1. Without explanation or context, the military judge commented, "With regards to outstanding issues, government, Prosecution Exhibit 1, I believe needed to be replaced with only the four clips of the video, is that correct?" Trial counsel responded, "That is correct, Your Honor, and I have provided the court reporter with a replacement [disc]." This exchange indicates the military judge had become aware the original disc contained more than video of the incident and trial counsel had given the court reporter a replacement disc that contained only four clips of the video. There is no indication that the military judge reviewed any of the other materials on the disc and the defense did not raise any concerns at trial.

In hindsight, it is clear that no such replacement disc made it into the record, as Prosecution Exhibit 1 contains folders labeled "Bldg 111," "Subject Photos," "Video Photos," "Videos," and three folders with the last names of 1st Lt JK and two of the victims. The "Videos" folder contains four clips covering the entirety of the dayroom incident. Some of the other folders contain photographs that were admitted in hard copy form, while others contain material that was not offered or admitted at trial.[4]

The appellant now contends the military judge erred by admitting an exhibit that contained materials for which no foundation had been laid and that the error materially

---

[4] At one point, the trial counsel indicated his intention to offer into evidence a disc that would contain copies of the photographs he was offering into evidence in hard copy as Prosecution Exhibits 2–5. The military judge rejected that plan, telling the trial counsel he was only accepting the hard copy, as a separate foundation would be required to admit the disc. It appears possible that the original disc admitted as Prosecution Exhibit 1 was the trial counsel's working copy of the evidence in the case.

prejudiced his substantial rights because the extraneous evidence contained highly graphic photographs of the victims' injuries and the crime scene.

Based upon the military judge's comment at the close of trial, we find that only the recording of the incident was admitted into evidence. While trial counsel's clumsy references to the disc instead of the video files themselves created ambiguity early in the proceeding, any ambiguity was resolved either at the time it was played for the military judge in open court or by the military judge's direction to substitute the disc originally referred to as Prosecution Exhibit 1 with a disc containing only the four video clips.

Although it was error for the trial counsel to provide the military judge with image files not admitted as evidence, we find that it was not plain error in this judge-alone trial. Under a plain error analysis, the appellant has the burden of showing that the error materially prejudiced a substantial right of the appellant. *Girouard*, 70 M.J. at 11. The military judge was clear in his own mind that the extraneous materials were not evidence since he directed the government to replace the disc with one containing only the videos. "Military judges are presumed to know the law and to follow it absent clear evidence to the contrary." *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007).

> When the issue of plain error involves a judge-alone trial, an appellant faces a particularly high hurdle. A military judge is presumed to know the law and apply it correctly, is presumed capable of filtering out inadmissible evidence, and is presumed not to have relied on such evidence on the question of guilt or innocence.

*United States v. Robbins*, 52 M.J. 455, 457 (C.A.A.F. 2000).

Accordingly, we presume that the military judge, having clarified that only the videos were admitted as evidence, did not consider any of the extraneous materials, and the appellant suffered no material prejudice by virtue of the error.

*Character Evidence*

Next, the appellant contends the military judge improperly admitted the testimony of a bartender who worked at the on-base club where the appellant and 1st Lt JK had been drinking immediately prior to going to the dormitory dayroom. This court reviews the military judge's evidentiary rulings under Mil. R. Evid. 404(b) for an abuse of discretion. *United States v. Staton*, 69 M.J. 228, 230 (C.A.A.F. 2010).

When the trial counsel tried to elicit testimony regarding an encounter that night between the female bartender and the appellant as the bar was closing, trial defense counsel objected on the basis that the testimony was impermissible character evidence under Mil. R. Evid. 404(b). After hearing argument from both sides, the military judge

ruled that he would admit the evidence solely for the limited purpose of establishing the appellant's intoxication level or mental state at that time. In response to a Mil. R. Evid. 403 objection, the military judge noted this was a judge alone trial and he did not find the evidence's relevance to be substantially outweighed by its prejudicial impact.

Pursuant to that ruling, the trial counsel elicited testimony that the bartender encountered the appellant and 1st Lt JK trying to go upstairs to an area that had closed for the night. She testified:

> They were proceeding to come up and they both seemed extremely intoxicated, her more so than him. He was holding her like support, like she couldn't stand up by herself. She was trying to say things, but I couldn't understand her, she was mumbling. I asked them why they were coming upstairs and proceeded to explain that everything upstairs was closed now, no customers were allowed upstairs and I needed them to proceed downstairs as we were closing.
>
> He proceeded to say that they were looking for a friend that was in the bathroom, so they needed to go past.
>
> I apologized and again said that they were not allowed to go up, but I could find one of my other employees to go look for him, but I do need you to go downstairs. After going back and forth he tried again to go up, and I told him that if I needed to I would go get Security Forces to come up here and remove him from the building. I explained it was nothing personal, but we needed the building secured so we can go home. Then he told me to stop being such a bitch that they just needed to find their friend.

At that point, trial defense counsel again objected on the basis of Mil. R. Evid. 404(b). The military judge overruled the objection, referring back to his previous ruling. The trial counsel resumed his examination, turning to the appellant's demeanor. The bartender continued:

> His demeanor was worse—he seemed agitated, slightly aggressive, if he wasn't going to get his way. I am used to this, in my job, but there was just something about it that was a little unsettling. He was telling [1st Lt JK]—he wouldn't allow her to speak. I asked her to clarify and repeat what she was saying. He would tell her to hush and told me what she was trying to say in regards to just trying to find their friends.

Although she admitted on cross-examination that she did not feel physically threatened by the appellant during this encounter, in redirect she stated, "I was extremely uncomfortable. It didn't feel like a normal drunk that was just not getting their way, he was more matter of fact about it than any intoxicated person should have been for not being allowed to do something."

The appellant argues that this testimony "was used primarily as impermissible character evidence to demonstrate that [the appellant] drinks heavily and has combative relationships with women."[5] He contends the evidence did not meet any of the exceptions within Mil. R. Evid. 404(b), which provides "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The military judge's decision to admit the evidence for the limited purpose of establishing the appellant's intoxication level or mental state was not an abuse of discretion. Evidence of the appellant's behavior shortly before the charged offense could be considered part of the res gestae of the crime because it is inextricably related to the charged offenses. *See United States v. Metz*, 34 M.J. 349, 351–52 (C.M.A. 1992); *United States v. Thomas*, 11 M.J. 388, 392–393 (C.M.A. 1981) (finding evidence of act which occurred in the midst of the events which gave rise to charged offense was admissible even without a limiting instruction). Similar evidence has also been found admissible under Mil. R. 404(b) to demonstrate the accused's hostility towards women. *See United States v. Watkins*, 21 M.J. 224, 227 (C.M.A. 1986) (finding prior acts of physical violence against women while under the influence of alcohol were admissible under Mil. R. Evid. 404(b) as they reasonably reflected hostile feelings towards women and their closeness in time to the charged act suggested these hostile feelings existed at the time of the charged act).

Additionally, we note that the trial counsel did not refer to the bartender's testimony during his findings argument and never contended that the appellant had a history of combative relationships with women. In contrast, although he did not mention the bartender's observations, the trial defense counsel argued the appellant's state of intoxication was relevant to his state of mind during the dayroom incident. This was the very purpose for which the military judge admitted the bartender's testimony. Absent any evidence to the contrary, we presume the judge considered the evidence in accordance with his ruling. *See Erickson*, 65 M.J. at 225. The trial defense counsel then explained the appellant's reaction to the behavior of others in the dayroom by using his level of intoxication to argue he only took what actions he thought were necessary to defend himself.

---

[5] The appellant does not assert on appeal that the military judge erred in his Mil. R. Evid. 403 ruling.

The military judge did not abuse his discretion in admitting this evidence as it was offered for a legitimate non-propensity purpose and, under these circumstances, the appellant was not prejudiced by its admission.

*Factual and Legal Sufficiency*

The appellant argues that the evidence was legally and factually insufficient to sustain his conviction for aggravated assault. We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). "The test for legal sufficiency of the evidence is 'whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.'" *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (quoting *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)). "The test for factual sufficiency is whether, after weighing the evidence . . . and making allowances for not having observed the witnesses," we ourselves are "convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *Turner*, 25 M.J. at 325) (internal quotation marks omitted). Applying these standards to the record in this case, we find the evidence legally and factually sufficient to support the findings of guilt.

The appellant specifically argues there was insufficient evidence to establish that he used a force likely to produce death or grievous bodily harm. *See Manual for Courts-Martial, United States*, Part IV, ¶ 54.b.(4)(a)(iv). The *Manual* explains "[w]hen the natural and probable consequence of a particular use of any means or force would be death or grievous bodily harm, it may be inferred that the means or force is 'likely' to produce that result." *Id.* at ¶ 54.c.(4)(a)(ii). The *Manual* defines grievous bodily harm as "serious bodily injury." *Id.* at ¶ 54.c.(4)(a)(iii). It elaborates that grievous bodily harm "does not include minor injuries, such as a black eye or a bloody nose, but does include fractured or dislocated bones, deep cuts, torn members of the body, serious damage to internal organs, and other serious bodily injuries." *Id.* The government need not show physical signs of that degree of harm in order to show that such harm was likely. *United States v. Rivera*, 54 M.J. 489, 492 (C.A.A.F. 2001). As our superior court noted,

> Just as a person firing a weapon and missing still causes a substantial risk of serious bodily injury for which there will be no physiological evidence, a blow to the head or torso that one time fortuitously fails to impact a vital organ or the temple, nevertheless risks serious bodily injury the next time.

*Id*. at 492 n.4.

The appellant's argument focuses primarily on the testimony of the government's neurologist who reviewed the video of the incident and the medical records of Ms. SG and conducted a neurological examination of her. After testifying about her specific

injuries, the expert described the mechanics of head trauma and its link to traumatic brain injuries. He then testified that, based on how the injuries occurred to Ms. SG, death was a "possibility" because she could have suffered various types of brain hemorrhages, an arterial dissection, or intracranial swelling, all of which could have led to a fatal outcome. He also testified there is a "lot of unpredictability" about what happens to someone who suffers a head injury. The appellant focuses on these answers to argue the evidence is insufficient to demonstrate the force he used was "likely to produce death or grievous bodily harm."

The expert also testified, however, that it was "very possible there could have been a worse outcome" for Ms. SG than the mild traumatic brain injury she actually experienced. He also testified that serious injuries short of death could also have occurred. The expert explained certain factors increase the probability of a serious or fatal outcome, including the amount of force used, the number of repetitions, and what caused the force. Furthermore, he testified that the use of the word "mild" in describing her traumatic brain injury did not necessarily mean Ms. SG would experience a "mild outcome." He explained that her injury could cause lingering symptoms that can interfere significantly with her life for years, potentially indefinitely.

The government points out that the medical expert testimony was not the only evidence relating to the means of force. The video itself provides evidence of the ferocity of the attack. Ms. SG lost consciousness during the assault and suffered swelling and bruising that lasted for about three months, along with a gash, abrasions, and a slight dent on her forehead. She also testified that although she suffered from headaches about once a week prior to the attack, her headaches after the attack were more frequent, recurring almost daily even at the time of trial.

We find that, taken in the light most favorable to the prosecution, the video, the expert testimony about potential outcomes, and the testimony of the lingering effects suffered by Ms. SG could cause a reasonable factfinder to determine that serious bodily injury was the natural and probable consequence of the appellant repeatedly slamming her head into the ground. Although the medical expert did not use the word "likely" when describing the most serious potential outcomes such as brain hemorrhage or intracranial swelling, he did testify that it was very possible her injuries could have been more severe than the traumatic brain injury she did suffer. He also testified that Ms. SG sustained a traumatic brain injury, which could, in light of the potential for persistent effects, reasonably constitute serious damage to internal organs or other serious bodily injury. One could reasonably find after viewing the video that a moderate or severe traumatic brain injury or other serious injury to the neck or face was likely given the intensity of the attack, and the absence of such injuries was due only to good fortune, not insufficient violence. Additionally, we ourselves, after weighing the evidence and making allowances for not having observed the witnesses, are convinced beyond a

reasonable doubt that force was used in a manner likely to produce grievous bodily harm and that the appellant is guilty of aggravated assault.

*Pretrial Confinement Credit*

The appellant asserts the military judge erred when he determined certain pretrial restrictions placed on the appellant were not tantamount to confinement such that he should receive administrative credit. We disagree.

In assessing whether an appellant is entitled to administrative credit for pretrial confinement, this court reviews de novo whether certain pretrial restrictions were tantamount to confinement. *United States v. King*, 58 M.J. 110, 113 (C.A.A.F. 2003).

Rule for Courts-Martial (R.C.M.) 305 applies to "pretrial confinement" and applies to "restriction tantamount to confinement" only when the conditions and constraints of the restriction constitute physical restraint that deprives the accused of his freedom. *United States v. Rendon*, 58 M.J. 221, 224 (C.A.A.F. 2003). Other forms of restriction do not trigger the application of R.C.M. 305. *United States v. Regan*, 62 M.J. 299, 302 (C.A.A.F. 2006). Ultimately, the "substantial impairment of the rights and privileges enjoyed by service members . . . is the common thread in cases in which [*Mason*] credit is due." *United States v. Calderon*, 34 M.J. 501, 506 (A.F.C.M.R. 1991) (quoting *United States v. Smith*, 20 M.J. 528, 531 (A.C.M.R. 1991)) (internal quotation marks omitted).

Analysis of whether certain pretrial restrictions amount to confinement is based on the totality of the circumstances. *King*, 58 M.J. at 113. Factors to consider during this analysis include

> the nature of the restraint (physical or moral), the area or scope of the restraint (confined to post, barracks, room, etc.), the types of duties, if any, performed during the restraint (routine military duties, fatigue duties, etc.), and the degree of privacy enjoyed within the area of restraint. Other important conditions which may significantly affect one or more of these factors are: whether the accused was required to sign in periodically with some supervising authority; whether a charge of quarters or other authority periodically checked to ensure the accused's presence; whether the accused was required to be under armed or unarmed escort; whether and to what degree the accused was allowed visitation and telephone privileges; what religious, medical, recreational, educational, or other support facilities were available for the accused's use; the location of the accused's sleeping accommodations; and

whether the accused was allowed to retain and use his personal property (including his civilian clothing).

*Id.* (quoting *Smith*, 20 M.J. at 531–32) (internal quotation marks and brackets omitted).

The appellant does not contest the facts found by the military judge at trial. At the time of the incident on 12 May 2013, the appellant was on temporary duty at RAF Mildenhall. Shortly after the incident, the appellant's commander at RAF Mildenhall placed certain restrictions on him. At the time, the appellant was suspected of committing serious assault on enlisted Airmen and his command reasonably considered that the appellant had a history of alcohol-related misconduct. The restrictions included not being allowed to leave the base except to go to a local restaurant or a nearby base's commissary. He could not travel anywhere except for food, work, the gym, and appointments with his attorney and alcohol counselor. The appellant was escorted by members of his unit during most, but not all, of these movements. Personnel from his unit would frequently check in on him during the day, usually every two hours. He kept his billeting door open during the day to accommodate those checks, but he did close it at night. Meanwhile, the appellant continued to stay in lodging with the rest of his deployed team and continued to work within his unit (though doing different duties than before the incident). The appellant made only one request to exceed his restriction—for a four-day trip to Scotland—and this trip was denied. These conditions continued until 30 May 2013.

The military judge found these restrictions were both lawful and were not tantamount to confinement. Although he found the restrictions were significant, the military judge found the appellant continued to work and live with his unit and he enjoyed liberty and privacy that was not consistent with being in confinement. In light of this, the military judge denied the defense's request for *Mason* credit.

Applying the *Smith* factors to the totality of circumstances, we find the military judge did not err in finding that appellant's restrictions were not tantamount to confinement. Even while under restraint, the appellant worked and lived among other members of his unit and was allowed to leave base for food and was allowed to go to the gym and to attend a meeting with his trial defense counsel. Moreover, the appellant, based on his testimony, retained almost complete autonomy outside duty hours regarding when he would pursue these other activities. Indeed the appellant's testimony indicated that coordination with other aircrew sharing the same official vehicle was often the primary limiting factor on his activities. While the appellant's commander denied the appellant's request to visit Scotland, the conditions as a whole were not so restrictive that the restraint was tantamount to being confined. Thus, we decline to grant appellant's request for administrative credit toward his sentence for that period of time.

Finally, the appellant suggests, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), that the military judge erred when he did not award confinement credit for violations of Article 13, UCMJ, 10 U.S.C. § 813, when appellant was required to pay his own lodging expenses for his Article 32, UCMJ, investigation.  By the time of that investigation, the appellant had returned to his permanent duty station in Nebraska.  The legal office at RAF Mildenhall arranged for the appellant to travel to England for the investigation but informed the appellant he could not stay on base.  The government also refused to reimburse him for $106.50 in expenses for off-base lodging.  The government's position was that the Joint Federal Travel Regulation prohibited the payment of per diem for a military member's travel for disciplinary actions.

Generally, the question of whether an appellant is entitled to credit for a violation of Article 13, UCMJ, is a mixed question of fact and law.[6]  *United States v. Mosby*, 56 M.J. 309, 310 (C.A.A.F. 2002).  We review findings of fact under a clearly erroneous standard and the ultimate question of whether the appellant is entitled to credit under Article 13, UCMJ, de novo.  *See United States v. Fischer*, 61 M.J. 415, 418 (C.A.A.F. 2005).  When a military judge makes a finding that there was no intent to punish an appellant, we will not overturn that finding unless it is clearly erroneous.  *See Mosby*, 56 M.J. at 310; *United States v. Smith*, 53 M.J. 168, 170 (C.A.A.F. 2000).  The appellant bears the burden of establishing his entitlement to credit.  *See Fischer*, 61 M.J. at 418.

Although the military judge disagreed with the government's interpretation of the Joint Federal Travel Regulation, he found no Air Force personnel had the intent to punish the appellant by refusing to pay for his lodging.  Although the military judge believed the Air Force had erred in refusing to reimburse the appellant, he considered this to be a finance dispute and concluded confinement credit was not the appropriate remedy.

The military judge affirmatively found no intent to punish in the government's failure to pay for the appellant's lodging.  The emails offered by the appellant for the purposes of the motion establish that Air Force personnel legitimately believed the appellant was not entitled to per diem under the applicable travel regulations.  In light of those emails, the military judge's finding as to intent was not clearly erroneous.

---

[6] Article 13, UCMJ, 10 U.S.C. § 813, provides in part, "No person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, nor shall the arrest or confinement imposed upon him be any more rigorous than the circumstances required to insure his presence . . . ."  Courts have identified two types of activities that violate this provision:  "(1) the intentional imposition of punishment on an accused prior to trial, i.e., illegal pretrial punishment; and (2) pretrial confinement conditions that are more rigorous than necessary to ensure the accused's presence at trial, i.e., illegal pretrial confinement." *United States v. Fischer*, 61 M.J. 415, 418 (C.A.A.F. 2005).  In this case, since the appellant was not confined, only intentional imposition of punishment is at issue.

ACM 38569

Irrespective of any intent to punish, Article 13, UCMJ, is violated if the activity at issue serves no legitimate, non-punitive purpose. *See Smith*, 53 M.J. at 172. There seems to have been some confusion at the time of trial exactly what "activity" might constitute punishment. The simplest description, and one that appears in the assignment of errors, is that the appellant had to "pay for his own lodging expenses." But the evidence conflates payment of those actual lodging expenses with per diem, which includes a set amount for meals and incidental expenses in addition to lodging.

Regardless, the government took remedial measures after the conclusion of the court-martial. When the defense raised the lodging issue as part of its clemency request, the staff judge advocate conceded the government had erred in refusing to provide no-cost lodging to the appellant. The staff judge advocate recommended giving confinement credit to the appellant if he filed a claim and the Air Force failed to promptly reimburse him. The appellant subsequently submitted a claim and was promptly reimbursed.

There is a legitimate fiscal interest in distinguishing between paying a military member required to travel in conjunction with disciplinary proceedings the set rate of per diem, which may exceed actual expenses, and paying reimbursement for actual expenses incurred. We also find there is a legitimate non-punitive purpose in requiring the appellant to establish the amount of any expenses he incurred through a claims process, as occurred here. The appellant has failed to show that the government's initial refusal to pay his lodging expenses constituted a violation of Article 13, UCMJ.

*Conclusion*

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the approved findings and sentence are

AFFIRMED.

FOR THE COURT

LEAH M. CALAHAN
Deputy Clerk of the Court

ACM 38569